EDWARD E. MAYER

*v.*

WEST SIDE DEVELOPMENT COMPANY.

[Decided March 30th, 1911.]

1. Where a contract for the building of a house was made and signed after the completion of the house, its terms control, and cannot be varied by parol evidence.

2. In a suit for the specific performance of a written contract for the sale of a lot and the erection of a building thereon, the purchaser to pay a stated amount for the lot and the actual cost of the building, evidence *held* to show that the contract was reduced to writing before, and not after, the cost of the building was ascertained so that the cost of the building, as stated in the contract, was not conclusive, so as to exclude parol testimony.

3. A court of equity will reform a written instrument where the contracting parties entered into it through a mutual mistake of fact; and hence, where a purchaser and a development company entered into a building contract, and when its terms were reduced to writing they were changed through mistake, the court will reform the instrument.

4. One excepting to the report of a master has the burden of showing that the master erred.

5. Where a contract between a development company and a purchaser provided that the purchaser should pay $800 for his lot and the exact cost of constructing a house which the development company was to build for him, the development company is entitled to remuneration for money expended for blank building contracts and for filing the same, for telephone charges notifying the president of the company that the building was injured, and for money expended in straightening it after it was damaged by wind.

6. Charges for examining the title, in order to obtain a mortgage on the lot, which the purchaser was to assume, is not a proper item of cost of erection of the building.

Heard on bill, cross-bill, answers, replications and proofs in open court.

*Mr. Charles E. S. Simpson,* for the complainant.

*Mr. James A. Gordon,* for the defendant.

GARRISON, V. C.

This is a bill filed by Edward E. Mayer against the West Side Development Company to procure the specific performance of a contract between the parties which bears date the 29th day of May, 1906. The facts, briefly stated, are as follows:

The West Side Development Company was the owner of lots in Jersey City. Mayer desired to procure a home. He was acquainted with Weber, the president of this company. He talked over this matter with Weber, and between them they finally agreed that he should purchase from the company lot No. 25 in block 852, and that the company should erect a house satisfactory to him upon this lot. The plans for the house were drawn by the architect of the company, and various estimates were procured from the different materialmen and laborers, and it was estimated that the house would cost about $5,400. The lot was agreed to be valued at $800. The understanding between Mayer

and Weber was that if the house should cost more than the $5,-400 estimated, the extra cost should be borne by Mayer, and if less than the $5,400 estimated, then Mayer should get the benefit of this. All of the witnesses who testify to hearing conversations to which Mayer was a party agree that this was the understanding. Mayer disputes it. He insists that while this was always said to him he never assented to it, and suggests that he always thought the development company intended to make a profit out of the erection of the house. He, however, admits that he was to pay, in addition to the contract price, for anything which he should order as an extra, and for anything which he should change in the plans and for which more money should be paid for doing the work than as originally planned.

I am convinced from the testimony that up until the time of the visit to the office of the lawyer of the company, which I shall next speak of, the parties had a thorough understanding as above stated. At this visit to the lawyer's office, some time about a week before the 29th of May, 1906, there were present Mr. Weber, the president; Mr. Boehler, the vice-president; Mr. Ludeke, the secretary; Mr. Blohm, the attorney of the company, and Mr. Mayer, the purchaser. At this meeting, Mr. Weber, acting for the company, instructed the lawyer to draw a contract for the sale of this lot to Mr. Mayer, and explained the terms of payment, and explained that the company was to erect a house on the lot at cost; that it was estimated that the cost of the lot was to be $800, and of the house $5,400, and that if the cost of the house exceeded $5,400, Mayer was to pay for it, and if it was less than $5,400, Mayer was to get the benefit of it. Blohm objected to putting these terms in the contract because he said they must have a fixed sum to go into the contract, and he therefore added the two items together and put the sum of $6,200 in it.

I do not believe that, in the minds of any of the parties present there was any understanding that the fixing of this sum was the final determination of the matter. I think it perfectly clear that they all understood that the contract as agreed upon was to be carried out, and that Mayer was to pay for any excess, and was to be credited with any gain under the contract price.

The contract, it was agreed, should be put in writing, and should be signed on the 29th of May, 1906. A contract was written, and on the 29th of May, 1906, Blohm and the officers of the company say that it was signed on behalf of the company. Mr. Mayer was ill at the time and did not attend, but he sent the check for $650 for the first payment, and the company immediately began the erection of the house, and had the same completed by the 1st of October, and Mayer moved in, and has been there ever since. During the course of the erection of the house, and up to December of 1906, Mayer seems to have had every opportunity to have learned the exact cost in every detail. The testimony is practically uncontradicted that he was a constant visitor to the office of the company and there had access to the bills and receipts and other matters which would have fully informed him, if he had desired to know, the cost of the work. However this may be, in December of 1906 he was shown a statement in a book which purported to show the exact cost to the company of the erection of the house. This statement showed that the house cost something in excess of $6,100. He asked concerning several of the items, but does not appear to have suggested for a moment that they had no right to charge him more than $5,400. Thereafter he actually himself signed the contract dated the 29th of May, 1906, which theretofore had never been signed by him. In view of all the facts of this case, I think that this is an immaterial detail. That contract does not even purport to deal with the subject-matter that the parties had agreed upon. At the time that that contract was drawn and when it is testified that it was signed on behalf of the company there was nothing on this lot. It was a vacant lot. It was not anybody's understanding that Mr. Mayer was to pay $6,200 for a vacant lot. It was everybody's understanding that the company was to erect a house on this lot, but that the exact expense to the company should be repaid to it by Mayer. The $6,200 is shown to have been a so-to-speak arbitrary figure put in there, and the understanding of each was that this house which was to be erected under a contract between the parties, although not alluded to in this written paper, was to be erected as before stated and paid for as before stated, and the company was to be reimbursed as before stated.

What I have just said was so obviously the mutual understanding that there would be no difficulty whatever were it not for the fact that Mayer did not sign the contract until the 22d day of December, 1906. At that time, as will be recalled from the previous statements, the building had been completed and the exact expense thereof to the company was known, and it is the complainant's contention that the contract then signed by him, in which the total cost was fixed at $6,200, was expressive of the true understanding between the parties and must be held to control. He points out that the contract speaks of a $4,500 mortgage "now upon the property," and argues that since there was no such mortgage upon the property upon the 29th day of May, 1906, and not until on and after September, 1906, it is clear that the contract was not drawn and signed on the 29th day of May, 1906.

Undoubtedly there is confusion of memory and lack of clear explanation of the time of reducing the contract to writing, and undoubtedly it is the law that if Mr. Mayer is correct in his contention that this contract was drawn and signed on the 22d day of December, 1906, after the cost of the building was known to the company, its terms must control, and I agree with him that no parol testimony should be permitted to contradict the terms of this written instrument.

I think it entirely clear, however, from the proofs that Mr. Mayer is mistaken in his contention (which, by the way, is put forth feebly even by himself) that the contract was made in December of 1906. I am inclined to think that the only event which took place in December was his signing the contract.

As previously recited, it is uncontradicted that the initial agreement between the parties was that Mayer was to buy the lot at $800 and the company was to erect a building on it at an approximate cost of $5,400, and that if it cost more Mayer was to pay the excess, and if it cost less Mayer was to get it at such lessened cost; and that an agreement, if written, would not have expressed the agreement of the parties unless it expressed it as just set forth. I think it proven that the contract and agreement as just set forth was, in Mayer's presence, explained to the lawyer, Blohm, and that he was instructed to prepare a written contract expressive of that understanding. I am

inclined to the opinion that the parties are mistaken in testifying that Blohm prepared such a contract on the 29th of May, although everybody acted upon the assumption that the understanding between them was in force and that the detail of the written contract would be attended to later. It is true beyond question that on the 29th of May the parties were to have attended at Mr. Blohm's office and were to have signed the written contract, and Mayer was to have paid his money, and the company was then to go on with the building. Upon that day Mayer was ill and could not personally attend, but he sent his payment of $650. The officers of the company testified that they signed the contract on behalf of the company, and Blohm so testifies; but there is some doubt about this because of the presence in the contract of the statement that the $4,500 mortgage is "now on the property." It is, of course, possible that since the contract was that Mayer was to make payments until he had reduced the amount to $4,500, and then was to assume a mortgage of that amount which was to be put upon the property, Mr. Blohm, in drawing the contract, considered that what was to be done would be done, and therefore used the language that he did and stated that the mortgage was "now upon the property," when he meant "would then be upon the property;" but even assuming that they are mistaken as to the day when they signed this contract, and assuming that they did not sign it until after September when the mortgage was put upon the property, I do not think that alters the case as to the essential facts or as to the rights of the parties and the law applicable thereto.

There is no testimony that at any time after this initial bargain it was in any way changed by any subsequent agreement; in fact, there is no testimony that there were ever any subsequent negotiations or conversations. I therefore find as a fact that the bargain was as I have above stated it, and that the written paper should have expressed that agreement, and if it did not do so, it was because of a mistake, and that such mistake was mutual.

The defendant in this suit, by its cross-bill, prays for a reformation of the contract, and I find that it is entitled thereto. It is unnecessary to cite authorities for the principle which, in my view, must be applied to this situation. It is perfectly settled

that if the court finds clear evidence of a mistake in a written contract it may reform the same to comply with what it finds to have been the agreement of the parties. I do find in this case that both parties agreed that Mayer should buy this lot at $800, and that the company should erect a house on it in accordance with the plans, &c., agreed upon between them, and that the exact cost thereof should be added to the $800 and paid by Mayer in accordance with the agreement between them; and that by a mistake the sum of $6,200 was placed in the written contract, and that it should be reformed so that in place of the said "$6,200" it should read "$800 for the said lot and the exact cost of erecting a house thereon under the plans and specifications agreed upon between the parties." When this has been inserted in the written contract, the whole contract as it then will stand is exactly expressive of the understanding between the parties, and that contract should be enforced.

Under all the circumstances, I am of opinion that a decree will do justice which has ascertained the amount which this house actually cost to build according to the plans and specifications; that in addition thereto there should be added anything that was done outside of the plans, if ordered by Mayer. The various taxes, assessments and other things that were agreed to be paid should be included, and the interest should be included in accordance with the terms of the contract; and then a time should be specified within which he should pay the amount necessary to be paid by him to reduce the total principal to $4,500, and then the company should be decreed at that time to give him the deed required by the contract, and the specific performance thus effectuated should be final.

The matter was then referred to a master to ascertain and report with respect to the above items, and upon the coming in of his report various exceptions were taken by each of the parties. The complainant's exceptions all go either to the point that the master reported more money as having been spent by the defendant company in the erection of the building than the proofs before him warranted him in so reporting, or to his findings as to the payment of taxes, assessments, and so forth. The burden of showing that the master was mistaken in these particulars was

upon the exceptant, and he has failed to convince me that the master erred, and I shall therefore dismiss his exceptions, and confirm the report so far as his exceptions affect the same.

The exceptions of the defendant are grouped by its counsel under various heads, and I shall, in disposing of them, follow such grouping.

The first is that the master failed to allow the sum of fifty cents paid by the defendant for blank building contracts, and the sum of $1.50 paid for filing the contracts, and ninety cents paid for telephoning to the president of the company for advice as to the injury of the building in course of erection, and $179.17 paid to Hughes & Sons for straightening the building when it was damaged by a wind storm which occurred in the course of the erection of the building. I think these exceptions are well taken, and that each of the items is a proper charge incurred in the erection of the building and should be allowed as against the complainant and in favor of the defendant.

The master also disallowed $41.61 paid Edward Russ for the examination of the title to the property incidental to the mortgage loan of $4,500. To this the defendant excepted. In this, I think, the master was correct, as I do not think this was included in the contract, or an expenditure in the course of the erection of the building, or, in any view, a proper item to be charged against the complainant.

A decree may be formulated in accordance with this opinion, and the master's report confirmed in all particulars saving as to the items which aggregate $182.07 just above alluded to. Such decree should be presented after notice.